UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
———————————————————————————X        Case No.

In re:
                                                                      Chapter 11
FUBER LLC

                          Debtor.
———————————————————————————X


AFFIDAVIT PURSUANT TO LOCAL
BANKRUPTCY RULE 1007-2

STATE OF NEW YORK        )
                                            )        SS.:
COUNTY OF NEW YORK   )

        Michael Pitsinos, duly sworn, deposes and says:

        I am the Manager of Fuber LLC, the above-referenced debtor and debtor-in-possession (the

"Debtor"). I submit this Affidavit in accordance with Local Bankruptcy Rules for the Southern

District of New York, Rule 1007-2.

        1.        The nature of the debtor's business and a concise statement of the circumstances

leading to the debtor's filing under chapter 11. The Debtor is a restaurant located at 103 West 14th

Street, New York, New York 10011 (the "Premises") currently operating under the name

"Bareburger".

        2.        Reasons for filing. Bareburger Group, LLC ("Franchisor") entered into a certain

franchise agreement (the "Agreement") with the Debtor Fuber, as franchisee, concerning the

operation of a "Bareburger" restaurant at the Premises.

        3.        Prior to the filing of this Chapter 11 case, over the last several weeks the Debtor

and the Franchisor were working on an agreement for the Debtor to no longer operate as a

Bareburger restaurant and to "debrand" its operations and convert to another restaurant concept.

Other affiliated restaurant entities of the Debtor who were also Bareburger franchisees known as FIDI District, Columbus and NGM also had to file for Chapter 11 protection two months ago and are now working on debranding agreements with the Franchisor for an orderly timely transition to non-Bareburger restaurants.

4.      The process of debranding, however, was allegedly going "too slow" for the Franchisor regarding this particular Debtor even though the Franchisor financially ruined the Debtor, and the Debtor was and is making its best efforts in a timely manner to debrand the restaurant as a Bareburger. Bareburger has been knit picking over the littlest details to make it as difficult as possible for the Debtor to maintain its operations, level of cash flow, pay its employees and debrand in an orderly manner, despite that Bareburger placed the Debtor into the financial ruins it is in currently.

5.      The Debtor and Bareburger and its affiliates have been involved in litigation since March 2, 2018, when the Debtor (and its affiliates) commenced a lawsuit in the New York State Supreme Court, New York County, entitled *El Toro Group LLC v. Bareburger Group LLC* (Index No.: 651018/2018) (the "State Court Franchise Litigation") seeking, among other relief, rescission of the Agreement and damages based upon Bareburger and its principals' violation of the New York State Franchise Act, fraud, and other bad conduct in the operation of the franchise and its dealings with franchisees, including Fuber.

**6.      Although the Debtor and Bareburger have been in State Court Franchise Litigation for many months over these issues, Bareburger has notified the Debtor at approximately 5:00 p.m. on Friday, March 15, 2019, that on Monday, March 18, 2019 at 11:30 a.m. it intends to file an application for a Temporary Restraining Order in the United States District Court for the Southern District of New York, based on an alleged trademark**

**infringement in an effort to put the Debtor completely out of business with an injunction disallowing the Debtor from using the Bareburger trademark while it debrands, thereby cutting off any cash flow to allow the Debtor to pay its creditors, to pay the government for past taxes that Bareburger itself failed to pay, to pay the landlord for a large amount of past due rent and to pay ongoing wages to employees and wipe out the millions of dollars in investment that the Debtor's principals have put into this business.**

7.     **Bareburger is forum shopping. This Court already has before it an adversary proceeding between the Franchisor and the Debtor and its related Chapter 11 affiliates involving the same exact claims.**

8.     The Debtor has therefore sought the immediate protection of Chapter 11 to stop the Franchisor from trying to put it out of business.

9.     In the State Court Franchise Litigation the Debtor has sought rescission of the Agreements on the basis of fraud, fraud in the inducement, material misrepresentations and omissions, illegality, and/or mutual mistake of fact, and to disgorge and restore to the Debtor all franchise fees, royalties, advertising fees, rebates, management fees, charges and other consideration paid by the Debtor to the Franchisor and its affiliates, including, but not limited to, RE-GRUB, LLC ("Re-Grub"),TIDM Corp. ("TIDM"), and Be My Burger, LLC ("BMB", and collectively with Re-Grub and TIDM the "Subsidiaries").

10.     The Franchisor took over control and management of the Bareburger restaurant at the Premises under Management Agreement dated November 1, 2016, as described below. From November 1, 2016 until September 10, 2018, the Franchisor has run the restaurant into the ground by intentionally failing to pay necessary expenses for the restaurant, including, but not limited to, rents (there is still over $125,333 of rent arrears due to the landlord of the Premises), payroll taxes

to the Internal Revenue Service, Sales and Withholding Taxes to New York State (approximately $123,000 as of October of 2018), a major food supplier called Sysco ($89,332 as of 12/31/18), even though it continued to pay itself royalties on a bi-weekly basis equal to 5% of the gross revenue of the restaurant which amounted to approximately, plus Branding and Royalty Fees and Management Fees.

11.    In addition, the Franchisor has improperly collected so-called "rebates" from vendors and suppliers of the Debtor, at the expense and to the detriment of the franchisees, the Debtor included, who are paying more than market price for the food and supplies, all to enrich the Franchisor and its affiliates at the expense and to the detriment of the Debtor and other franchisees in the "Bareburger" franchise system.  Specifically, under the Bareburger franchise system franchisees are forced to purchase food and supplies from vendors designated by Bareburger.  Bareburger and the vendor mark-up the price of food and supplies that franchisees are forced to purchase well-above the market price that other restaurants pay for the same food and supplies.   The mark-up is then kicked back to the franchisor, at the expense and detriment of the franchisees, who end up paying considerably more than the market price for supplies.   The so-called "rebate" is not savings to the franchisee, as one would expect, but it a fraudulent mark-up and kickback scheme orchestrated by Bareburger and its principals, who have extracted millions of dollars from unwitting franchisees.

12.    Furthermore, the franchise agreement between the Debtor and the Franchisor does not permit the Franchisor to collect rebates, much less rebates that end up costing the franchisees considerably more than other restaurants.  The Franchisor ran the "Bareburger" franchise in a deceitful and fraudulent manner, for its own benefit exclusively, and has intentionally sought to

4

drain any value from the Debtor store at the expense and to the detriment of the Debtor's creditors and members.

13.    Upon information and belief, unsecured creditors are owed approximately $225,000 that the Franchisor has refused to pay.  This figure is subject to verification.  However, the Franchisor has failed and refused to provide complete access to the books and records of the operations of the restaurant to the Debtor and has intentionally failed to file Federal and New York State payroll and sales tax returns.

14.    Based upon historical data supplied by Bareburger Group, LLC, the restaurant owned by the Debtor had gross annual income of approximately $1,811,056. There were sufficient funds to pay these creditors until the Franchisor diverted these funds to its own pockets. The Franchisor intentionally did not pay these creditors, which left the Debtor laden with debt, and has necessitated this Chapter 11 filing.

15.    Furthermore, the Franchisor has commingled the revenues collected from the Debtor with the revenues collected from other "Bareburger" restaurants and its own funds, through an entity formed by Bareburger and its principals called TIDM Corp.

16.    Bareburger returned control of the restaurant to the Debtor on September 10, 2018, after it drained and looted the assets of the Debtor's business.   At the time Bareburger returned the restaurant to the Debtor the rent had not been paid in over three months, the main food supplier, Sysco, had not been paid for over three months, and the restaurant owed substantial sales taxes and payroll taxes to the government.

17.    Since management and operations of the restaurant were restored to the Debtor on September 10, 2018, the Debtor has struggled to maintain the restaurant as a viable operation as a result of the franchisor's conduct. On January 28, 2019, Bareburger purportedly terminated the

franchise agreement, which the Debtor has sought to rescind under the New York State Franchise Act in the State Court Franchise Litigation. Since the purported termination, the Debtor commenced the process of rebranding the restaurant to operate as anything but a "Bareburger". The Debtor is in the process of rebranding the restaurant under another concept and has retained the services of a well-respected restaurant management company to assist the Debtor in this process so that the creditors and investors can be repaid.

18.     Bareburger now claims that the Debtor is infringing upon the Bareburger trademarks because it is using them without permission.   Bareburger's position on the trademarks is ironic given that Bareburger and its individual principals have been found joint and severally liable for having procured the Bareburger trademark through a fraudulent conveyance.

19.     Specifically, the individual members and officers of the Franchisor EURIPIDES PELAKANOS ("Euripides"), GEORGE RODAS ("Rodas"), GEORGE DELLIS ("Dellis"), EFTYCHIOS PELEKANOS ("Eftychios"), JOHN SIMEONIDIS ("Simeonidis"), SPIRIDON APOSTOLATOS ("Apostolatos"), and  DEMETRIOS VOIKLIS ("Voiklis") (collectively, the "Individual Members") engaged in, and perpetrated a fraud upon the Debtor by making materially false statements and/or omissions to deceive and induce the Debtor into entering into the Agreements with the Franchisor.

20.     The Franchisor and its principals and officers, EURIPIDES PELAKANOS ("Euripides"), GEORGE RODAS ("Rodas"), GEORGE DELLIS ("Dellis"), EFTYCHIOS PELEKANOS ("Eftychios"), JOHN SIMEONIDIS ("Simeonidis"), SPIRIDON APOSTOLATOS ("Apostolatos") (the "Individual Members"), were found to have perpetrated a fraud by misappropriating and fraudulently conveying the assets, intellectual property, trademarks, branding and goodwill of non-party Bareburger Inc. to Bareburger, for no consideration, and then

purportedly licensing the right to use the stolen trademarks and intellectual property to the Debtor and other franchisees.

21.    These facts have already been established and determined in a prior litigation in New York State Supreme Court, entitled *Stavroulakis v. Pelekanos* (New York County, Index No.: 653478/2015) (the "Stavroulakis Case"), in which the court issued an Order granting judgment in favor of the Plaintiff against the Franchisor and the Individual Members, finding each of them jointly and severally liable for trademark infringement with respect to the "Bareburger" trademarks (the "Trademarks and IP"), and fraudulently conveying all of the assets of the original "Bareburger" franchisor, Bareburger Inc., to the Franchisor, among other things.

22.    The Franchisor never disclosed the fact that it did not own the "Bareburger" intellectual property and trademarks that it purported to license to the Debtor under the Agreements.  These allegations form the basis of the Debtor's claims for rescission, which the Debtor is pursuing – along with other Bareburger franchisees – in the State Court Franchise Litigation.

23.    In short, the Franchisor and the Individual Members deceitfully presented themselves as the rightful owners of the Bareburger trademarks and intellectual property, even though they knew that the Franchisor did not have good title to, or any rights to license such Trademarks and IP to the Debtor and the other Bareburger franchisees, thus giving rise to the Debtor's claim for rescission under the New York State Franchise Act and common law.

24.    In addition, the Franchisor and the Individual Members failed to disclose material litigation that was pending against the Franchisor and the Individual Members for trademark infringement, fraud, and other intentional torts that the Franchisor and the Individual Members were required to disclose in the Franchisor's Franchise Disclosure Document ("FDD"), upon

which the Debtor relied when deciding to invest in the Bareburger franchise and entering into the subject franchise agreements, thus giving rise to Debtor's claims for rescission.

25.     The Franchisor's Franchise Disclosure Documents are riddled with materially false and misleading statements and/or omissions concerning, among other things, the amount of the so-called "rebates" collected by the Franchisor, the relationship between Bareburger Inc. and the Franchisor, the Franchisor's rights to the trademarks and intellectual property, and products that the Debtor were required to purchase in connection with the Bareburger franchise system.

26.     During the time Bareburger and the Individual Members managed the debtor's restaurant, they schemed to defraud the Debtor of its ownership of the restaurant by looting the assets of the restaurants and misappropriated monies collected for sales taxes, withholding taxes, and other liabilities that the Debtor and their investors may have personally liability for.

27.     While the Franchisor was managing the restaurant it had failed to pay more than three months of rent to the landlord of the Premises on behalf of the Debtor, intentionally causing defaults under the lease for the Premises so that the Franchisor and/or the Individual Defendants could take over the Premises under a new lease with the landlord, at the expense and to the detriment of the Debtor, its creditors and members.  Indeed, the lease for the Premises is the Debtor's primary asset, and to the extent it is lost as a result of the Franchisor's and the Individual Members' fraudulent actions the Debtor would have no ability to pay its creditors, and would have to liquidate, at a tremendous loss to the creditors and members of the Debtor.

28.     Instead of paying such taxes, rents and other necessary debts, the Franchisor and the Individual Members misappropriated and diverted the funds to themselves through the payment of exorbitant management fees, advertising fees, rebates, mark-ups and other charges that

have financially crippled the Debtor's restaurant and left the Debtor and their investors saddled with the liabilities.

29.    The Franchisor and the Individual Members intentionally sought to saddle the Debtor and their investors with the liabilities to force them to sell the assets to the Franchisor and the Individual Members for nominal or no consideration and leave the Debtor, the other restaurants and their investors holding the debts.

30.    The Franchisor and the Individual Members intentionally caused a default under a promissory note while exercising their "step-in-rights" in order to try and enforce the note against the Debtor's and other restaurants' assets.  Meanwhile, they now claim that the Debtor and the other restaurant entities are liable pursuant to the promissory note for the amount of $991,464.34 plus interest thereon at 5% per annum from May 5, 2017 to August 3, 2017, plus interest thereon at 18% per annum from August 4, 2017.   Worse, the Franchisor and/or Individual Defendants, or someone operating under their control, signed my name to the promissory note without my permission to make it appear as a legitimate debt.  Also, the Franchisor claims that they advanced approximately $600,000 to the Debtor (and four other franchisees controlled by the Debtor's parent company and Class-A Member, El Toro Group LLC) in May 2017, even though the Franchisor never provided any proof of such monies being advance to, or for the benefit of the Debtor or its affiliates.

31.    The Debtor seeks to rescind the Agreements and disgorgement and restitution of all franchise fees, royalties, management fees, advertising fees, rebates, mark-ups and other charges collected by the Franchisor, Re-Grub, TIDM and their affiliates under said agreements, and monetary damages the amount of which is not fully determined.

32.     Thus, the Debtor requires the protection of Chapter 11, *inter alia*, to reorganize its business in an orderly manner, work out a plan to repay its creditors and investors, and pursue the Franchisor and the Individual Members for the damages it has inflicted on the Debtor and emerge as a continued viable business entity.

33.     This case was not originally commenced under chapter 7 or chapter 13.

34.     No committee was organized prior to the order for relief in this chapter 11 case.

35.     The Debtor has filed Official Form 204 setting forth the following information with respect to each of the holders of the twenty (20) largest unsecured claims, excluding insiders: the name, the address (including the number, street, apartment or suite number, and zip code, if not included in the post office address), the telephone number, e-mail address, the name(s) of person(s) familiar with the debtor's account, the amount of the claim, and an indication of whether the claim is contingent, unliquidated, disputed or partially secured;

36.     There are secured creditors of the Debtor. Information with respect to each of the holders of the five (5) largest secured claims: the name, the address (including the number, street, apartment or suite number, and zip code, if not included in the post office address), the amount of the claim, a brief description and an estimate of the value of the collateral securing the claim, and whether the claim or lien is disputed:

> US Foods, Inc.
> 1051 Amboy Avenue
> Perth Amboy NJ 08861
> Claim: amount unknown
> Collateral: UCC-1 restaurant assets
>
> Corporation Service Company
> 801 Adlai Stevenson Drive
> Springfield IL 62703
> Claim: amount unknown
> Collateral: UCC-1 restaurant assets

Bareburger Group, LLC
35-37 36th Street, 4th Fl
Astoria NY 11106
Claim: amount unknown
Collateral: UCC-1 restaurant assets
THIS CLAIM IS DISPUTED

37.     Summary of the debtor's assets and liabilities: Assets - unknown at this time until books and records are turned over by Bareburger Group LLC to Debtor); Liabilities - $228,631, plus unknown tax liabilities to IRS and New York State for payroll taxes, sales taxes and withholding taxes (to be confirmed upon examination of books and records of Debtor in possession of Franchisor).

38.     The Debtor does not have any publicly held shares of stock, debentures or other securities.

39.     List of all of the Debtor's property in the possession or custody of any custodian, public officer, mortgagee, pledgee, assignee of rents or secured creditor, or agent for any such entity, giving the name, address, and telephone number of each such entity and the court in which any proceeding relating thereto is pending: None (to be confirmed upon examination of books and records of Debtor in possession of Franchisor)

40.     The Premises leased or held under other arrangement from which the Debtor operates its business:103 West 14th Street, New York, New York, 10011 .

41.     The location of the Debtor's substantial assets – 103 West 14th Street, New York, New York, 10011; location of Debtor's books and records – Baker Tilly Virchow Krause, LLP, CPAs, One Penn Plaza, Suite 3000, New York, NY 10119, Tel. No. (212) 697-6900; Bareburger Group LLC, 35-37 36th Street, 4th Fl, Astoria, NY 11106; Paychex Payroll; Bareburger Internal Staff;  Fuber LLC's's accountant's office at 21-03 44th Avenue, Long Island City, NY 11101;

Apostolatos CPA, PLLC, 3005 38th Avenue, Long Island City, NY 11101.There are no assets of the Debtor held outside the territorial limits of the United States.

42.     The nature and present status of each action or proceeding, pending or threatened, against the debtor or its property where a judgment against the debtor or a seizure of its property may be imminent:  None.

43.     The names of the individuals who comprise the debtor's existing senior management, their tenure with the debtor, and a brief summary of their relevant responsibilities and experience: Michael Pitsinos, Manager, 2013 to November 1, 2016, Day-to-Day Management of Restaurant Operations, 3 Years.   From November 1, 2016 to September 10, 2018, I do not know who the senior manager of the restaurant operations, but upon information and belief, the Franchisor had operated the restaurant through the following individuals:  Eftychios Pelekanos, Euripides Pelekanos, Spiros Apostolatos, Jimmy Voiklis, George Rodas, George Dellis, John Simeonidis, Jr. was who operated this restaurant location; Jelica Dragoljevic, the Franchisor's current Controller, who has managed and overseen the finances, collection of revenues, and payment of expenses of the Debtor's restaurant.

Additional Information if Business is to Continue. The Debtor intends to continue to operate its business:

(1) the estimated amount of the weekly payroll to employees (exclusive of officers, directors, stockholders and partners) for the thirty (30) day period following the filing of the chapter 11 petition: $65,010.

(2) the amount paid and proposed to be paid for services for the thirty (30) day period following the filing of the chapter 11 petition to, officer, stockholder and directors: $5,000; and

(3) a schedule, for the thirty (30) day period following the filing of the chapter 11 petition, of estimated cash receipts and disbursements, net cash gain or loss, obligations and receivables expected to accrue but remain unpaid, other than professional fees, and any other information relevant to an understanding of the foregoing:

Estimated Cash Receipts from Sales for 30-day period:               $170,000

Estimated Disbursements for 30 Day Period:

| | |
|---|---|
| Monthly Payroll | $75,600 |
| Executive Salary | 5,000 |
| Rent | 20,500 |
| Cost of Goods Sold | 59,516 |
| Expenses | 17,204 |

Total Estimated Disbursements for 30 Day Period        -$177,820

Net Cash Gain for 30 Day Period                    ($7,820)

Outstanding Account Receivables:  unknown

Dated: March 17, 2019
       New York, New York


                                          /s/ Michael Pitsinos
                                          Michael Pitsinos
                                          Manager


Sworn to before me this
17th day of March 2019

/s/ Daniel R. Wotman
   Notary Public